IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-368-D

| | |
|---|---|
| BOBBY EUGENE GODDARD, JR. ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| MICHAEL B. BURNETT, TRUSTEE ) | |
| ) | |
| Appellee. ) | |

On June 28, 2024, Bobby Eugene Goddard, Jr. ("Goddard" or "appellant") filed a notice of appeal [D.E. 1] and moved for leave to file an interlocutory appeal from the United States Bankruptcy Court for the Eastern District of North Carolina ("the bankruptcy court") [D.E. 2]. Goddard contends that the bankruptcy court improperly declined to approve his Chapter 13 Plan after finding that Goddard did not propose the plan in good faith. See 11 U.S.C. § 1325(a)(3). This court granted Goddard's motion to file an interlocutory appeal [D.E. 18]. On October 17, 2024, Michael B. Burnett, Trustee ("Trustee" or "appellee") responded and asked this court to affirm the bankruptcy court [D.E. 17]. On October 21, 2024, Goddard replied [D.E. 19].

As explained below, the bankruptcy court properly construed 11 U.S.C. § 1325 and permissibly rejected Goddard's Chapter 13 Plan ("Plan") in which Goddard sought to retain three luxury vehicles at the expense of his creditors. The bankruptcy court permissibly found that Goddard did not propose his Plan in good faith. Thus, the court affirms the bankruptcy court's judgment.

I.

Goddard lives in Garner, North Carolina, with his spouse and mother-in-law. See In re Goddard, 662 B.R. 223, 224 (Bankr. E.D.N.C. 2024). Goddard served in the United States Army for 25 years and has chronic post-traumatic stress disorder ("PTSD"). See id. Goddard receives treatment from a psychologist and psychiatrist at the United States Department of Veteran Affairs ("VA"). See id. On September 1, 2023, Goddard filed for Chapter 13 bankruptcy. See id.

In 2012, Goddard retired from the Army and currently works for the Department of Labor as a Veteran Employment Specialist, earning a monthly salary of $7,167.33. See id. Additionally, Goddard receives a monthly retirement pension of $2,748.00 and a monthly VA disability income of $1,353.39. See id. After various payroll deductions, Goddard receives a monthly net income of $9,589.34. See id. Goddard's spouse receives a monthly net income of $2,285.40. See id.

Goddard owns three vehicles: a 2015 Chevrolet Corvette ("Corvette"), a 2021 GMC Sierra 1500 Crew Cab SLT ("Truck"), and a 2022 Genesis G70 ("Genesis") (collectively, "vehicles"). See id. In January 2021, Goddard financed the purchase of both the Corvette and the Truck for $45,692.00 and $61,805.85, respectively. See id. In February 2022, Goddard financed the purchase of the Genesis for $57,716.18. See id. "The vehicles are encumbered by liens securing debts that had a total balance of $137,606.64 on the petition date." Id. Goddard's spouse owns an unencumbered 2015 Nissan Altima. See id.

Under Chapter 13, Goddard is an above-median income debtor. See id. "To determine how much income debtors are capable of paying, [section 1325(b)] uses a statutory formula known as the means test to calculate debtors' disposable income." Bledsoe v. Cook, 70 F.4th 746, 747 (4th Cir. 2023) (quotations omitted); see Mort Ranta v. Gorman, 721 F.3d 241, 251 (4th Cir. 2013); 11 U.S.C. §§ 707(b)(2), 1325(b)(2), 1325(b)(3). Goddard filed Official Form 122C-2 "to calculate

2

his disposable income that must be paid to unsecured creditors pursuant to 11 U.S.C. § 1325(b)(1)(B)." Goddard, 662 B.R. at 224. Goddard used the means test to deduct from his current monthly income his average monthly payments for the debts secured by the vehicles. See id. Goddard intends to keep the vehicles, and section 1325(b) permits Goddard to claim the deductions concerning the vehicles. See id. After including the vehicle deductions, Goddard calculated his monthly disposable income as -$233.98. See id. Goddard's Plan proposed to satisfy the claims secured by the vehicles with two monthly payments of $3,070.00 followed by 58 monthly payments of $3,700.00 to the Trustee. See id. at 225. Thus, Goddard's total payments for the three vehicles under the Plan will be $220,740.00. See id.

On March 19, 2024, the bankruptcy court held an evidentiary hearing on Goddard's Plan. See id. at 224. At the hearing, Goddard testified that he and his spouse rely on the vehicles for transportation and other purposes. Goddard works a hybrid schedule and sometimes commutes nine miles from his residence to work. See id. at 225. Goddard drives the Corvette daily but characterizes the Truck as his "everyday driver." Id. Goddard uses the Truck for yard maintenance tasks and for hauling objects. See id. Goddard also drives the Corvette as a "stress reliever" to combat his PTSD. Id. Goddard's spouse occasionally drives the Genesis to work in Durham, North Carolina. See id. Goddard's mother lives in Plymouth, North Carolina and Goddard uses the Genesis to transport her to appointments in Raleigh at least four times a year. See id. Goddard and his spouse enjoy the three vehicles for travel and consider travel as beneficial to their marriage. See id. At the hearing on March 19, 2024, Goddard testified about the financial circumstances that led to his Chapter 13 bankruptcy petition. See id. Goddard loaned money to family members, incurred credit card debt, and took out four personal loans with a total balance of $35,833.70. See id. The bankruptcy court observed that "[b]ased on the timing of [Goddard's] personal loans, it

3

appears that during the 21 months prior to filing his petition, [Goddard] may have serviced the debts related to the vehicles with the very loans he now seeks to discharge." Id. at 228.

The Trustee asked the bankruptcy court to reject Goddard's Plan because the Plan failed to satisfy section 1325(a)(3)'s good-faith requirement. Although the Trustee did not challenge Goddard's entitlement to the deductions under the means test, the Trustee cited Goddard's proposed retention of the three vehicles at the expense of his general unsecured creditors as evincing a lack of good faith. See id. at 226. Specifically, the Trustee argued that Goddard's "needs and the nature of his employment do not appear to be dependent on [retaining] all three vehicles." Id. at 225–26. The Trustee noted "that the proposed retention of the [v]ehicles affects the result of the means test and the calculation of [Goddard's] disposable monthly income." Id. at 226. If Goddard surrendered any one of the vehicles, then Goddard would have disposable income to pay a higher dividend to his general unsecured creditors. See id. Likewise, if Goddard retained all three vehicles, Goddard would do so at the expense of his general unsecured creditors. See id. The Trustee argued that Goddard's proposed retention of the three vehicles evinced Goddard's failure to propose his plan in good faith. See id.

Goddard disagreed with the Trustee. Goddard asked that the bankruptcy court not to challenge his "retention of assets for which expenses are a permitted deduction on the Chapter 13 means test." Id.

The bankruptcy court found that Goddard did not propose his Plan in "good faith" under section 1325(a)(3) and rejected Goddard's Plan. In support, the bankruptcy court examined the text and history of section 1325(a)(3) and the addition the means test with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005. See Goddard, 662 B.R. at 225–28. The bankruptcy court observed that although the BAPCPA implemented

4

"significant changes to the way Chapter 13 debtors calculate their disposable income, . . . . BAPCPA left unaltered the good faith requirement of [section] 1325(a)(3)." Id. at 226. The bankruptcy court then examined "whether [section] 1325(a)(3) remains a viable element of confirmation, exclusive from a debtor's compliance with the formulaic calculation of disposable income under [section] 1325(b)(2)." Id.

The bankruptcy court acknowledged that the United States Court of Appeals for the Ninth Circuit held that BAPCPA forecloses a court from considering a debtor's payments to secured creditors under 11 U.S.C. § 1325(b) as part of an inquiry into good faith under 11 U.S.C. § 1325(a)(3). See id. at 226 (citing In re Welsh, 711 F.3d 1120, 1133 (9th Cir. 2013)). Moreover, the bankruptcy court noted that a bankruptcy court in this district reached the same conclusion. See In re Alexander, 344 B.R. 742, 752 (Bankr. E.D.N.C. 2006).

The bankruptcy court rejected these interpretations as "incomplete" and "erroneous" and noted that these interpretations "completely ignore that 11 U.S.C. § 1325(a)(3) . . . is still alive and well." Goddard, 662 B.R. at 226. In doing so, the bankruptcy court cited two more recent bankruptcy court decision that "have come to the opposite, more realistic, and more accurate conclusion." Id. First, in In re Broder, 607 B.R. 774, 778 (Bankr. D. Me. 2019), the bankruptcy court noted that section 1325(a)(3) and 1325(b) have different purposes in that "a debtor contributing all of his or her disposable income under § 1325(b) may still be found to have proposed his or her plan in bad faith if, when viewed in the context of the facts of a particular case, the luxury item suggests that the debtor is not making an honest effort to repay his or her creditors." Id. Likewise, the United States Bankruptcy Court for the District of Colorado reached the same conclusion. See In re Williams, 394 B.R. 550, 572 (Bankr. D. Colo. 2008).

5

The bankruptcy court also acknowledged that in Bledsoe v. Cook, 70 F.4th 746 (4th Cir. 2023), the United States Court of Appeals for the Fourth Circuit cited In re Welsh, 711 F.3d 1120 (9th Cir. 2013), "in holding the Chapter 13 means test permits above-median income debtors to deduct the actual costs of their mortgage payments when calculating their disposable income." Bledsoe, 70 F.4th at 748 (citing Welsh, 711 F.3d at 1130). The bankruptcy court, however, distinguished Bledsoe because Bledsoe "did not involve questions of the debtor's good faith in proposing their Chapter 13 plan." Goddard, 662 B.R. at 227. Instead, Bledsoe addressed "only a debtor's entitlement to deductions on the means test." Id.

The bankruptcy court concluded that section 1325(a)(3)'s good-faith requirement is independent of the section 1325(b) means test. In support, the bankruptcy court noted that Congress retained section 1325(a)(3)'s requirement that a debtor propose a plan in "good faith" when enacting the BAPCPA. See id. "The confirmation process cannot be purely robotic as [Goddard] would like, because the court must still evaluate and determine, pursuant to [section] 1325(a)(3), whether the Plan has been proposed in good faith." Id.

After interpreting section 1325(a)(3) to require a debtor to propose a plan in good faith, the bankruptcy court applied the Fourth Circuit's good-faith standard. In assessing "good faith" under the Bankruptcy Code, the basic inquiry is "whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter] in the proposal or plan." Deans v. O'Donnell, 692 F.2d 968, 972 (4th Cir. 1982) (quotation omitted); see In re Goeb, 675 F.2d 1386, 1390 n.9 (9th Cir. 1982); In re Rimgale, 669 F.2d 426, 431 (7th Cir. 1981); In re Terry, 630 F.2d 634, 635 n.3 (8th Cir. 1980) (per curiam). As for Goddard's Plan, the bankruptcy court noted that "[a]lthough the Plan includes a meager projected dividend to general unsecured creditors when no dividend is required under the disposable income test, the debtor's minimal

6

voluntary contribution does not overcome the aspects of the Plan regarding the [v]ehicles." Goddard, 662 B.R. at 228. The bankruptcy court found that Goddard did not "establish any necessity for [retaining] all three [v]ehicles." Id. Rather, the bankruptcy court observed, "[u]nder the terms of the [P]lan, [Goddard] would emerge from bankruptcy with three unencumbered vehicles and the discharge of over $78,000.00 in unsecured debt." Id. The bankruptcy court also found that "[b]ased on the timing of Goddard's loans, it appears that during the 21 months prior to filing his petition, [Goddard] may have serviced the debts related to the vehicles with the very loans he now seeks to discharge." Id. Thus, the bankruptcy court found that Goddard had not "proposed the Plan in good faith" as section 1325(a)(3) requires and denied confirmation. Id.

II.

Goddard argues that the bankruptcy court's reason for denying confirmation exceeds the scope of the good-faith inquiry under section 1325(a). See [D.E. 14] 5. Goddard concedes that a debtor must file a Chapter 13 plan in good faith but argues that good faith "is not a requirement that allows a bankruptcy court to utilize its own policy preferences against the specific text of the Bankruptcy Code." Id. According to Goddard, the bankruptcy court "found [Goddard's] plan was not proposed in good faith because the three vehicles were not a necessity." Id. at 7. Goddard then argues that the bankruptcy court's necessity analysis falls outside the scope of the good-faith inquiry under section 1325(a) in light of section 1325(b)'s means test. See id. at 8–15.

According to Goddard, "the good faith test, historically, had merely required that the [Chapter 13] plan or arrangement comport with the provisions, purposes and spirit of the particular relief chapter." Id. at 10 (quotation omitted). Goddard concedes that courts analyzed whether a debtor proposed a plan in good faith before Congress enacted the BAPCPA. See id. at 10–11. Goddard, however, maintains that when Congress added the disposable income requirement in

7

section 1325(b), Congress intended the "very specific language of section 1325(b)(2)" to displace "any such use of chapter 13 good faith, even assuming that phrase has any relevance to minimum payments after the 1984 amendments." Id. at 11 (quotation omitted). Essentially, Goddard argues that compliance with section 1325(b)(2)'s means test always equals compliance with 1325(a)(3)'s good-faith requirement. See id. at 11–12. Goddard admits the Fourth Circuit has not addressed his interpretation of section 1325, but Goddard argues the Fourth Circuit "came extremely close to directly addressing the issue" in Bledsoe. Id. at 12.

Goddard rejects the bankruptcy court's conclusion that section 1325(a)(3) requires good faith "separate and distinct from the means test and disposable income inquiry." Id. at 14. Goddard argues that the bankruptcy court "is incorrect that the good faith inquiry is an opportunity to override specific statutory provision that already address an issue in precise detail." Id. According to Goddard, the Bankruptcy Court never identified "a purpose, provision or spirit" of the Bankruptcy Code Goddards's Plan violated." Id. At bottom, Goddard argues "[t]he Bankruptcy Court erred in finding that Mr. Goddard's plan was not filed in good faith when it was consistent with the provisions, purposes, and spirit of chapter 13 as set forth in the Code." Id.

The Trustee disagrees with Goddard. The Trustee argues the "bankruptcy court did not abuse its discretion in reviewing through the lens of good faith [Goddard's] proposal to continue servicing debt secured by the [v]ehicles at the rate of nearly $3,000.00 per month in light of a minimal distribution to unsecured claims." [D.E. 16] 13. The Trustee also argues that Bledsoe does not support Goddard's contention that satisfying the means test in section 1325(b)(2) prohibits consideration of "good faith under [section] 1325(a)(3)." Id. at 13. To the contrary, the Trustee contends that section 1325(a)(3)'s requirement that a debtor propose a plan in good faith remains an "independent requirement for plan confirmation that has not been narrowed or diminished by"

8

the means test. Id. at 14. In support, the Trustee notes that Congress chose not to amend section 1325(a)(3)'s language in the BAPCPA. Thus, according to the Trustee, the pre-BAPCPA good-faith standard that the Fourth Circuit discussed in Deans v. O'Donnell, 692 F.2d 968 (4th Cir. 1982) and Neufeld v. Freeman, 794 F.2d 149 (4th Cir. 1986), remains applicable. The Trustee urges the court to affirm the bankruptcy court's interpretation of section 1325 and to affirm the bankruptcy court's finding that Goddard did not propose his Plan in good faith. See id.

## III.

District courts have jurisdiction to hear appeals from the "final judgments, orders, and decrees" of bankruptcy courts. See 28 U.S.C. § 158(a)(1). The court has jurisdiction to review a bankruptcy court's denial of confirmation of a plan under Chapter 13. See Mort Ranta, 721 F.3d at 250.

A district court reviews a bankruptcy court's legal determinations de novo and its factual findings for clear error. See In re White, 487 F.3d 199, 204 (4th Cir. 2007); In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc., 453 F.3d 225, 231 (4th Cir. 2006); Schlossberg v. Barney, 380 F.3d 174, 178 (4th Cir. 2004). "[I]n reviewing a bankruptcy case on appeal, a district court can consider only that evidence which was presented before the bankruptcy court and made a part of the record." In re Bartlett, 92 B.R. 142, 143 (E.D.N.C. 1988); see Fed. R. App. P. 10(a); Union Bank v. Blum, 460 F.2d 197, 202 (9th Cir. 1972).

The parties dispute the interplay between section 1325(b)'s means test and the good-faith requirement in section 1325(a)(3). In analyzing this dispute, the court examines the ordinary meaning of the statutory text, interprets specific provisions of the text within the broader statutory context, applies certain canons of construction, and considers relevant precedent. See, e.g., Jones v. Hendrix, 599 U.S. 465, 472–80, 490–91 (2023); Lac Du Flambeau Band of Lake Superior

9

Chippewa Indians v. Coughlin, 599 U.S. 382, 387–88 (2023); MOAC Mall Holdings LLC v. Transform Holdco LLC, 598 U.S. 288, 298–303 (2023); Sackett v. EPA, 598 U.S. 651, 679–83 (2023); Fin. Oversight Mgt. Bd. for P.R. v. Centro De Periodismo Investigativo, Inc., 598 U.S. 339, 346–50 (2023); Ciminelli v. United States, 598 U.S. 306, 314–16 (2023); Santos-Zacaria v. Garland, 598 U.S. 411, 416–23 (2023); Wilkins v. United States, 598 U.S. 152, 157–59 (2023); West Virginia v. EPA, 597 U.S. 697, 721–23 (2022); Boechler, P.C. v. Comm'r of Internal Rev., 596 U.S. 199, 203–08 (2022); Penneast Pipeline Co. v. New Jersey, 594 U.S. 482, 506–08 (2021); Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 137 (2020); Opati v. Republic of Sudan, 590 U.S. 418, 425–29 (2020); Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 333 (2020); see also Mayor & City Council of Baltimore v. BP P.L.C., 31 F.4th 178, 220 (4th Cir. 2022); Brown & Williamson Tobacco Corp. v. Food & Drug Admin., 153 F.3d 155, 162 (4th Cir. 1998); United States v. Jackson, 759 F.2d 342, 344 (4th Cir. 1985).

The court begins with the statute's text. See United States v. Quality Stores, Inc., 572 U.S. 141, 145 (2014); Mississippi ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 168 (2014); Sebelius v. Cloer, 569 U.S. 369, 376 (2013); BP Am. Prod. Co. v. Burton, 549 U.S. 84, 91 (2006); Cela v. Garland, 75 F.4th 355, 364 (4th Cir. 2023), cert. denied, 144 S. Ct. 2657 (2024); Davidson v. United Auto Credit Corp., 65 F.4th 124, 128 (4th Cir. 2023). The court must give effect "to every clause and word of a statute." Loughrin v. United States, 573 U.S. 351, 358 (2014); see In re Bateman, 515 F.3d 272, 277 (4th Cir. 2008); Hedin v. Thompson, 355 F.3d 746, 750 (4th Cir. 2004). The inquiry ceases if the statute is unambiguous, and "the statutory scheme is coherent and consistent." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); Brown & Williamson Tobacco Corp., 153 F.3d at 162.

Section 1325 reads in relevant part:

10

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> . . .
>
> > (3) the plan has been proposed in good faith and not by any means forbidden by law;
>
> . . .
>
> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> . . .
>
> > (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. § 1325(a)–(b)(1)(B).

> In turn, 11 U.S.C. § 1325(b)(2) provides:
>
> (2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—
>
> > (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
> >
> > > (ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and
> >
> > (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2). Essentially, section 1325(b)(2) defines "disposable income" as "current monthly income received by the debtor less amounts reasonably necessary to be expended for the debtor's maintenance and support, for qualifying charitable contributions, and for business

11

expenditures." Hamilton v. Lanning, 560 U.S. 505, 510 (2010) (quotations omitted); see 11 U.S.C. § 1325(b)(2).

Under the BAPCPA, current monthly income "is calculated by averaging the debtor's monthly income during what the parties refer to as the 6–month lookback period, which generally consists of the six full months preceding the filing of the bankruptcy petition." Hamilton, 560 U.S. at 510; see 11 U.S.C. § 101(10A)(A)(i). "The phrase 'amounts reasonably necessary to be expended' in § 1325(b)(2) is also newly defined. For a debtor whose income is below the median for his or her State, the phrase includes the full amount needed for 'maintenance or support,' but for a debtor with income that exceeds the state median, only certain specified expenses are included." Hamilton, 560 U.S. at 510 (internal citations omitted); see 11 U.S.C. §§ 707(b)(2), 1325(b)(2)(A)(i). The formula for above-median-income debtors is known as the "means test" and is reflected in a schedule (Form 22C) that a Chapter 13 debtor must file. See Hamilton, 560 U.S. at 510; In re Liverman, 383 B.R. 604, 606–09 (Bankr. N.J. 2008).

Under section 1325(a), "[e]xcept as provided in subsection (b), the court shall confirm a plan if" the plan meets all the requirements in subsections (a)(1) to (a)(9). See 11 U.S.C. § 1325(a). Subsection (a)(3) requires "the plan [be] proposed in good faith and not by any means forbidden by law." Id. at § 1325(a)(3). Moreover, even if nobody objects to a Chapter 13 plan, section 1325(a) requires a court to determine if the plan was proposed in good faith. See United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 277 n.14 (2010); In re Richardson, 643 B.R. 324, 331 (Bankr. D.S.C. 2022); In re Soppich, 516 B.R. 733, 752 (Bankr. E.D. Pa. 2014). Section 1325(b) instructs that "[i]f the trustee or the holder of an unsecured claim objects to the confirmation of a plan, then the court may not approve the plan unless, as of the effective date of the plan" the requirements of subsection 1325(b)(1)(A) or (b)(1)(B) are met. 11 U.S.C. § 1325(b). Under

subsection 1325(b)(1)(A), a debtor must pay unsecured creditors in full. See id. at § 1325(b)(1)(A); Hamilton, 560 U.S. at 509. Under subsection 1325(b)(1)(B), a debtor must pay all "projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan . . . ." 11 U.S.C. § 1325(b)(1)(B); see Hamilton, 560 U.S. at 509.

The court must give effect to section 1325(a)(3)'s good-faith requirement as well as the means test in section 1325(b). See, e.g., Corley v. United States, 556 U.S. 303, 314 (2009) (a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void, or insignificant"); Hibbs v. Winn, 542 U.S. 88, 101 (2004) (same). Thus, the court reads section 1325(a) to require that a court confirm a plan if the plan meets the requirements of section 1325(a)(1)–(9). The statute then provides an exception in subsection (b) to approving the plan. The exception may apply where "the trustee or holder of an unsecured claim objects to confirmation of the plan." 11 U.S.C. § 1325(b)(1). If the trustee or holder of an unsecured claim objects to confirmation of the plan, "then the court may not approve the plan unless, as of the effective date of the plan," the requirements of subsection (b)(1)(A) or (b)(1)(B) are met. Id. at § 1325(b)(1)(A)–(B). Accordingly, the court concludes that a court must ensure, inter alia, that "the plan has been proposed in good faith" under subsection 1325(a)(3) and also ensure compliance with section 1325(b) if there is an objection to the plan. See, e.g., In re Meehean, 611 B.R. 574, 588, 594 (Bankr. E.D. Mich.), aff'd, 619 B.R. 371 (E.D. Mich. 2020); In re Walker, No. 3:19-BK-33182, 2020 WL 1696097, at *1–12, 14 (Bankr. E.D. Tenn. Apr. 2, 2020) (unpublished); In re Broder, 607 B.R. at 778–80; In re Bradley, 567 B.R. 231, 238–39 (Bankr. D. Me. 2017); In re Wood, 543 B.R. 915, 924–25 (Bankr. D. Idaho 2016); In re Wrobel, 525 B.R. 211, 216–18 (Bankr. W.D.N.Y. 2015); In re Rivera, 480 B.R. 112, 117 (Bankr. D.P.R. 2012), aff'd, 490

13

B.R. 130 (B.A.P. 1st Cir. 2013); In re Cordle, No. 08-82332-TLS, 2009 WL 762184, at *2 (Bankr. D. Neb. Mar. 19, 2009) (unpublished); In re Styles, 397 B.R. 771, 774–75 (Bankr. W.D. Va. 2008); In re Williams, 394 B.R. at 572.

The statute's legislative history confirms this textual analysis. See United States v. Perkins, 67 F.4th 583, 610 (4th Cir. 2023) ("While resort to legislative history is unnecessary, we have occasionally examined it to confirm the textual analysis."); In re Eli Lilly & Co., 37 F.4th 160, 165 (4th Cir. 2022) ("This textual conclusion is confirmed by legislative history, although any reference to legislative history in these circumstances might be gratuitous."); Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 657 (4th Cir. 2019) ("The extensive legislative history accompanying the TCPA confirms its broad reach."); Hately v. Watts, 917 F.3d 770, 785 (4th Cir. 2019) ("The plain language of this definition encompasses email. And the legislative history confirms that Congress intended this definition to encompass email."). When Congress enacted the Bankruptcy Reform Act of 1978, Congress included the confirmation requirement that "[t]he plan has been proposed in good faith and not by any means forbidden by law." In the Bankruptcy Reform Act of 1978, Bankruptcy Reform Act of 1978, 92 Stat 2549, § 1129(a)(3), Congress did not define the term good faith. In evaluating "good faith" as used in the Bankruptcy Reform Act of 1978, the Fourth Circuit adopted the "generally accepted definition of 'good faith' as used in Chapter 11 of the old Bankruptcy Act" to be instructive. O'Donnell, 692 F.2d at 972. "[T]he basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter] in the proposal or plan." Id. (quotations omitted). "Congress never intended, of course, that Chapter 13 serve as a haven for debtors who wish to receive a discharge of unsecured debts without making an honest effort to pay those debts." Id. Thus, in analyzing good faith, a court may consider, inter alia, "the percentage of proposed repayment, the

debtor's financial situation, the period of time payment will be made, the debtor's employment history and prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor." Neufeld, 794 F. 2d at 152; see In re Solomon, 67 F.3d 1128, 1133–34 (4th Cir. 1995).

In 2005, "Congress enacted the . . . [BAPCPA] to correct perceived abuses of the bankruptcy system." Ransom v. FIA Card Servs., N.A., 562 U.S. 61, 64 (2011); Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 231–32 (2010). "In particular, Congress adopted the means test—the heart of BAPCPA's consumer bankruptcy reforms—to help ensure that debtors who can pay creditors do pay them." Ransom, 562 U.S. at 64 (cleaned up). In enacting the BAPCPA, Congress could have removed the requirement in section 1325(a)(3) that the plan be proposed in good faith. Congress did not. See Hamilton, 560 U.S. at 515–17 ("Pre-BAPCPA bankruptcy practice is telling because we will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure."). Tellingly, Congress retained the good-faith requirement in section 1325(a)(3) and added the means test. Cf. id. at 522 (discussing the good-faith requirement in section 1325(a)).

Goddard cites Bledsoe and argues that Bledsoe precludes the bankruptcy court's interpretation of section 1325. See [D.E. 14] 11–12. The court rejects Goddard's argument. Bledsoe concerned only a debtor's entitlement to certain deductions on the means test and not the interaction between the means test and the good-faith requirement in section 1325(a)(3). See Bledsoe, 70 F.4th at 747–51.

In reaching its conclusion, the court acknowledges that other courts have relied on the Ninth Circuit's reasoning in Welsh to hold that a court cannot equate a debtor's payments to

secured creditors in accordance with 11 U.S.C. § 1325(b)(2) as an absence of good faith under 11 U.S.C. § 1325(a)(3). See, e.g., In re Mycek, No. 5:12-CV-369, 2013 WL 9994332, at *5–7 (C.D. Cal. Oct. 22, 2013) (unpublished); In re Page, 658 B.R. 178, 188–93 & n.45 (Bankr. E.D. Wash. 2024); In re Aquino, 630 B.R. 499, 616–17 (Bankr. D. Nev. 2021). Even accepting the premise that a court cannot equate a debtor's payments to secured creditors in accordance with 11 U.S.C. § 1325(b)(2) with an absence of good faith under 11 U.S.C. § 1325(a)(3), Welsh does not require this court to reverse the bankruptcy court.

In Welsh, the Ninth Circuit answered two specific questions: "[o]ne was whether payments of secured debts that were permissible under Congress's calculation of disposable income nevertheless could be impermissible under the good faith test. The Ninth Circuit [in Welsh] held that the good faith test could not be used in that manner. Another question was whether social security income . . . could . . . be included for purposes of the good faith test. Again, the good faith test could not be used that way." In re Strong, 661 B.R. 638, 651 (Bankr. C.D. Cal. 2024); see Welsh, 711 F.3d at 1130–35. In other words, in Welsh, the Ninth Circuit held that a court cannot consider a debtor's commitment (or noncommitment) of certain funds from his disposable income calculation in assessing good faith under section 1325(a)(3) if the Bankruptcy Code exempts those funds in section 1325(b). See Welsh, 711 F.3d at 1130–35. Nonetheless, in Welsh, the Ninth Circuit did not eliminate the totality of the circumstances good faith inquiry under section 1325(a)(3) or prevent a court from assessing whether a debtor "manipulated the Bankruptcy Code or filed in an inequitable manner." Welsh, 711 F.3d at 1132; see Strong, 661 B.R. at 651–52; In re Natera, No. 17-14112-B-13, 2022 WL 17070429, at *10 (Bankr. E.D. Cal. Nov. 16, 2022) (unpublished).

16

Even under Welsh, courts have "a duty to consider all facts and circumstances, except considerations of what income, and how much income, a debtor is devoting to the proposed plan in any way different from the formulas mandated by Congress." Strong, 661 B.R. at 651 (emphasis in original). Thus, even under Welsh, a court may consider, inter alia: (1) whether a debtor has misrepresented the facts, manipulated the Bankruptcy Code, or proposed his plan in an inequitable manner; (2) a debtor's history of bankruptcy filings; (3) whether the debtor intended to frustrate collection of a state-court judgment; and (4) whether the debtor behaved egregiously. See In re Welsh, 711 F.3d at 1132. Moreover, these factors comport with the factors that the Fourth Circuit has instructed courts to examine in assessing good faith. See, e.g., Solomon, 67 F.3d at 1133–34; Neufeld, 794 F.2d at 152; O'Donnell, 692 F.2d at 972.

Goddard relies on Welsh to argue that compliance with section 1325(b) forecloses the bankruptcy court's good faith inquiry under section 1325(a)(3). See [D.E. 14] 13–16. Unlike the bankruptcy court in Welsh, however, the bankruptcy court in this case did not reject Goddard's Plan because Goddard did not include exempted funds, such as social security income, in calculating his "disposable income" under 11 U.S.C. § 1325(b)(2). Likewise, the bankruptcy court did not reject Goddard's Plan because it disagreed with the calculations under 11 U.S.C. § 1325(b)(2). Rather, the bankruptcy court examined the totality of the circumstances animating Goddard's Plan and found that Goddard did not propose the Plan in good faith.

Under Goddard's Plan, Goddard retained all three debt-encumbered vehicles. The bankruptcy court examined the totality of the circumstances and found these vehicles amounted to "luxuries" that Goddard retained "at the expense of his creditors." Goddard, 662 B.R. at 228. The bankruptcy court also found Goddard's Plan sought "to improve [Goddard's] financial condition at the expense of his unsecured creditors. Under the terms of the Plan, [Goddard] would emerge

17

from bankruptcy with three unencumbered vehicles and the discharge of over $78,000.00 in unsecured debt." Id. The bankruptcy court also found that "[b]ased on the timing of [Goddard's] personal loans, it appears that during the 21 months prior to filing his petition, [Goddard] may have serviced the debts related to the vehicles with the very loans he now seeks to discharge." Id.

The bankruptcy court's findings are not clearly erroneous. Ample evidence supports the bankruptcy court's ultimate factual finding that Goddard did not propose his Plan in good faith. The Bankruptcy Code also supports the bankruptcy court's legal conclusions about how to construe sections 1325(a) and (b). Notably, "Congress adopted the means test . . . . to help ensure that debtors who can pay creditors do pay them." Ransom, 562 U.S. at 64. Goddard's Plan, however, seeks to accomplish the opposite. On this record, the bankruptcy court permissibly reviewed the totality of the circumstances and found that Goddard did not propose his Plan in good faith. See, e.g., Strong, 661 B.R. at 659; Walker, 2020 WL 1696097, at *1–12; Broder, 607 B.R. at 778–80; Bradley, 567 B.R. at 238–39; Wrobel, 525 B.R. at 216–18; Cordle, 2009 WL 762184, at *2. Accordingly, the court affirms the bankruptcy court's judgment.

IV.

In sum, the court AFFIRMS the bankruptcy court's judgment.

SO ORDERED. This _13_ day of March, 2025.

JAMES C. DEVER III
United States District Judge